**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**GEORGE N. JUBA,**
    Plaintiff,         Civil Action No. 26-1603
                 Jury Trial Demanded
v.

**GREEK CATHOLIC UNION OF THE USA,**
    Defendant.

**CIVIL COMPLAINT**

Plaintiff George N. Juba, by undersigned counsel and pursuant to Fed. R. Civ. P. 8(a),

files this Civil Complaint against Defendant Greek Catholic Union of the USA and alleges as

follows:

**I. JURISDICTION**

1. The jurisdiction of this Court is invoked pursuant to Section 107 of the Americans with

Disabilities Act, 42 U.S.C. § 12117(a), incorporating by reference Section 706 of Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e-5; Section 7 of the Age Discrimination in

Employment Act, 29 U.S.C. § 626(c)(1); 28 U.S.C. §§ 1331 and 1343(a)(4); and this Court's

supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2. Juba timely filed a Charge of Discrimination with the Equal Employment Opportunity

Commission and the Pennsylvania Human Relations Commission on June 4, 2025, alleging

disability discrimination arising from Defendant's May 8, 2025 decision to terminate his

employment.

3.  On February 9, 2026, Juba filed an Amended Charge adding age discrimination. The

Amended Charge arose from the same termination decision, the same employment relationship,

the same decisionmakers, and the same course of conduct alleged in the original Charge. The

1

ADEA claim was filed within 300 days of the May 8, 2025 termination decision. The PHRA age-discrimination allegations relate back to the original PHRC filing because they arise from the same subject matter and occurrence alleged in the original Charge.

4. On May 6, 2026, the EEOC issued a Notice of Right to Sue. This Complaint is filed within 90 days of Juba's receipt of that Notice.

5. More than one year has passed since the June 4, 2025 PHRC filing, and the PHRC has not dismissed the action or entered into a conciliation agreement naming Juba as a party.

## II. THE PARTIES

6. George N. Juba is an adult individual born in July 1954. He resides at 605 Darlington Road, Beaver, Pennsylvania 15009. At all relevant times, Juba was an employee of Defendant within the meaning of the ADA, ADEA, and PHRA.

7. Defendant Greek Catholic Union of the USA ("GCU") is a Pennsylvania Fraternal Benefit Society with its principal place of business at 5400 Tuscarawas Road, Beaver, Pennsylvania 15009. At all relevant times, Defendant employed fifty-two persons in Pennsylvania and was a covered employer within the meaning of the ADA, ADEA, and PHRA.

## III. FACTUAL BACKGROUND

### A. Juba's Employment History

8 Juba is currently seventy-two years old. He was seventy years old when Defendant voted to terminate his employment and when his employment ended. He was employed by Defendant for approximately forty-five years, from May 19, 1980 through June 2025.

9. Juba held various positions during his tenure with Defendant, including

Secretary/Treasurer, before he assumed the position of President in November 2007.

10. As Defendant's President and CEO, Juba was the chief executive and administrative head of GCU. He was responsible for overseeing the marketing and management of more than two billion dollars in insurance and investment policies and products, supervised a staff of fifty-two persons, and served as President and CEO of GCU Holding Company, Inc. and its subsidiaries: Seven Oaks Country Club, Inc.; GCU Real Estate Company, Inc.; and GCU Agency, Inc.

11. Juba's employment was governed by a written Employment Agreement executed August 26, 2011. The Employment Agreement established an Employment Period running from September 1, 2011 through December 31, 2016, with automatic one-year renewals unless either party provided thirty days' prior written notice of intent not to renew. By May 2025, the Agreement had been renewing annually since January 2017.

11. Juba's 2024 base salary was $375,060.06. In November 2024, Defendant's Board of Directors approved a four percent salary increase effective January 1, 2025, bringing his 2025 base salary to approximately $390,062.46, with an additional performance bonus of up to six figures based on company performance.

12. During his eighteen years as President, Juba received a raise and/or bonus every year of his tenure, including a substantial bonus in 2023 for completing the Seven Oaks swimming pool and racquet complex project.

13. In November 2024, approximately two months before Juba's medical leave, Defendant's Board unanimously reelected him President of all four companies and appointed him to all four subsidiary boards. No performance concerns were raised or disclosed to Juba at that time.

3

14.  During forty-five years of employment and eighteen years as President, Juba never received a disciplinary action, verbal warning, written warning, performance improvement plan, or negative performance review.

**B. The Employment Agreement's Termination Requirements**

15. Section 9 of the Employment Agreement limits Defendant's right to terminate Juba's employment to three grounds: (a) death or disability following six consecutive months or 180 aggregate business days of inability to perform major duties; (b) without cause, upon at least thirty days' prior written notice from either party; or (c) for cause, at Employer's election, by providing Employee with written notice outlining the "Cause" reason for the Employer's action.

16.  Section 9(c) of the Employment Agreement defines "Cause" as "just and reasonable cause, including: (i) dishonest or fraudulent behavior, or convictions of a felony or a misdemeanor (other than traffic violations); (ii) the material breach of any covenant contained in this Agreement; or (iii) the failure of Employee to meet fair and reasonable performance standards established by Employer from time to time."

17.  Exhibit A to the Employment Agreement sets forth Juba's duties as President and CEO, including the duty to "Uphold the Constitution and By-Laws of the GCU, carry out or cause to be carried out the mandates of the Convention, the Board of Directors and the Executive Finance Board" and to "Act as the President/CEO of the GCU Holding Company, Inc. and its subsidiaries."

18.  Section 3(b) requires Juba's duties to be rendered "primarily from Employer's offices in Beaver, Pennsylvania." The Agreement contains no business-hours requirement. Section 11(c) provides that the Agreement "constitutes the entire agreement between the parties

hereto and supersedes any prior understanding or agreements between them respecting the subject matter," and Section 11(d) requires all amendments to be "made in writing and signed by all the parties hereto."

19. GCU's Employee Handbook establishes a progressive discipline process requiring a Performance Observation Form, informal warning, formal warning, and a performance improvement plan of thirty to ninety days before dismissal.

**C. Juba's Disability and Medical Leave**

20. Juba suffers from advanced heart failure and underwent heart-transplant surgery in January 2025. His condition substantially limited cardiovascular function, circulation, and his ability to care for himself during his hospitalization and recovery. His post-transplant condition requires lifelong immunosuppressant medication, cardiac monitoring, and recurring medical appointments.

21. Juba's post-transplant care is managed by a specialist in Advanced Heart Failure Cardiology at Allegheny Health Network. On April 28, 2025, that specialist issued a Return to Work Certificate stating that Juba's medical leave began January 14, 2025, that he was released to return to work effective April 28, 2025, and that he could perform all functions of his position with or without accommodation. The accommodation Juba required upon return consisted of periodic medical appointments, blood work, and follow-up care, without modification to his core job duties.

22. Defendant's Chairman George Kofel confirmed by letter dated January 17, 2025 that Juba's leave commenced concurrently with his short-term disability, that short-term disability would continue until May 20, 2025, and that Juba was entitled to return to work upon receipt of a physician's certification.

23. On or about January 17, 2025, while Juba remained hospitalized, Defendant suspended his access to GCU's Office 365 suite, including his work email.

24. On April 4, 2025, while Juba remained on short-term disability, Chairman Kofel wrote to Juba's power of attorney asking that Juba postpone attending the April 5, 2025 Board meeting, citing a "busy Board agenda" and the fact that Juba was "still on short term disability and under doctor's care." Juba was not permitted to attend the first-quarter 2025 Board meeting, at which Defendant approved a new Employee Handbook.

25. Juba returned to work on May 1, 2025.

**D. Defendant's Handling of Juba's PTO During Medical Leave**

26. GCU's Employee Handbook, in the 2015 version provided by HR Manager Pamela Dietrich to Juba's family at the onset of his leave, entitled employees with twenty-one or more years of service to twenty-five days of PTO per year, allotted in January and available for immediate use. Juba had more than forty years of service and was entitled to twenty-five days, or 187.5 hours, of PTO for 2025.

27. When Juba's son Christopher requested a copy of the current Employee Handbook in January 2025, Dietrich said it was "at the lawyer's office still being worked on." The new Employee Handbook was not approved by the Board until the April 2025 quarterly meeting, more than three months into Juba's leave.

28. On January 8, 2025, Dietrich disclosed for the first time that "Effective January 2020, the GCU Board and Executive Staff updated the PTO policy," replacing the front-loaded annual allotment with a per-paycheck accrual system capped at forty hours of annual carryover. This change had never been communicated to Juba. Dietrich confirmed in writing that Juba's PTO

6

had never been tracked in GCU's Paylocity payroll system and that there was no documentation of his PTO usage in any prior year.

29. On January 10, 2025, Chairman Kofel responded on behalf of the full Board to the family's request that Juba be permitted to use his full 2025 PTO entitlement before commencing short-term disability: "the GCU Company Policy regarding PTO and short term disability benefits must dictate the benefits that are provided."

30. Defendant applied the revised PTO policy to Juba's leave and allowed only 44.4231 hours of PTO before placing him on short-term disability beginning January 14, 2025. Compared to the 187.5 hours available under the 2015 Handbook, Defendant withheld 143.08 hours of PTO, equal to approximately $28,609.19 at Juba's base hourly rate.

31. GCU's Employee Handbook provides that accrued PTO is paid in the final paycheck upon involuntary termination. Defendant fired Juba; he did not resign. At the time of termination, Juba had accrued additional PTO that was not paid in his final paycheck.

32. Juba did not receive his 2024 performance bonus. Whether bonuses were awarded to Defendant's executive officers for 2024 is a fact within Defendant's exclusive knowledge.

**E. GCU's Financial Performance and the Chairman's April 2025 Report**

33. In 2024, GCU experienced a financial loss. In his April 2025 report, CFO Tim Demetres attributed the loss to Federal Reserve interest-rate increases, stating: "Starting in the first quarter of 2022, the Federal Reserve increased interest rates eleven times to moderate growth and tame runaway inflation." Demetres also reported that GCU maintained a solvency ratio of 110% and that AM Best and KBRA reaffirmed GCU's A- credit ratings in 2024.

34. In his April 2025 Chairman's Report, Chairman Kofel stated that Seven Oaks Country Club "continued positive growth in revenue and memberships during 2024," and that

the new Swimming Pool and Racquet Complex "enjoyed a banner season during its first full year of operation."

**F. Jeremy Stephenson's Age-Based Statements During Juba's Leave**

35. During Juba's medical leave, Jeremy Stephenson served as Interim President of Seven Oaks Country Club and as direct supervisor of Juba's son Christopher, who managed Seven Oaks' daily operations. Stephenson had served as GCU's Chief Operating Officer before Juba's leave.

36. During Juba's medical leave, Stephenson repeatedly asked Christopher Juba what Stephenson could do to get Juba to retire. Stephenson also referred to Juba and GCU CFO Tim Demetres as "Statler and Waldorf," the elderly balcony characters from The Muppets. These comments reflected Stephenson's view that Juba and Demetres were too old to remain in leadership.

**G. Juba's Return to Work and Defendant's Medical Questioning**

37 Juba returned to work on May 1, 2025 and provided Defendant with the written Return to Work Certificate from his treating physician, certifying that he was able to perform all functions of his position with or without accommodation.

38. On May 1, 2025, Board Co-Chair John J. Urban and GCU General Counsel Theodore Trbovich met with Juba and questioned him about the nature and severity of his heart condition. Neither Urban nor Trbovich was a medical professional. Juba had already provided a facially sufficient return-to-work certification from his treating physician.

39. During the May 1 meeting, Defendant presented Juba with a written "Back to Work Meeting" memorandum listing four Board expectations: (1) that Juba keep regular GCU

business hours per the Employee Handbook; (2) that Juba track PTO through Paylocity; (3) that Juba acknowledge Jeremy Stephenson's continuation as Interim President of Seven Oaks until the June 2025 Board meeting; and (4) that Juba acknowledge the Board's plan to engage an outside consultant to review Seven Oaks operations. Juba signed the Back to Work Memo on May 1, 2025.

40. On May 7, 2025, Juba forwarded Stephenson's resignation email to the GCU Board, stating: "I had an excellent meeting with our Vice Chairman of the Board John Urban and our General Counsel, Ted Trbovich. They brought me up to speed on a few GCU issues they wanted me to be aware of and other matters as it pertains to the expectations as the President and CEO of the GCU to which I agreed."

41. During the May 1 meeting, Juba informed Urban and Trbovich that he believed the GCU Board's appointment of Stephenson as Interim President of Seven Oaks was improper under the Seven Oaks Bylaws. The Seven Oaks Board did not have identical membership to the GCU Board, and Juba believed the GCU Board lacked authority to appoint an Interim President of Seven Oaks without action by the Seven Oaks Board.

42. Juba's contractual job description under Exhibit A to the Employment Agreement expressly required him to "Uphold the Constitution and By-Laws of the GCU, carry out or cause to be carried out the mandates of the Convention, the Board of Directors and the Executive Finance Board."

43. On May 2, 2025, Juba informed Stephenson that the GCU Board's appointment of Stephenson as Interim President of Seven Oaks was procedurally invalid under the Seven Oaks Bylaws, and that Juba would remain in the role of President of Seven Oaks.

44. Later on May 2, 2025, Stephenson emailed Chairman Kofel and Vice-Chair Urban,

9

copying General Counsel Trbovich, resigning as Interim President and stating: "Earlier today, George Juba informed me that the board's action to appoint me as Interim President of Seven Oaks Country Club (SOCC) was, in his view, procedurally invalid and therefore nullified. He also conveyed that he will remain in the role of President. In addition, both George Juba and Chris Juba have expressed concerns regarding the direction of the club, particularly as it relates to engaging an outside consultant. Given these developments, I no longer believe I am in a position to effectively serve the organization in this capacity. Accordingly, effective immediately, I am resigning from the role of Interim President of SOCC."

### H. Juba's Termination

45.  On May 8, 2025, seven days after Juba returned to work and six days after Stephenson resigned as Interim President of Seven Oaks, Defendant's Board voted to terminate Juba's employment.

46. On May 9, 2025, Defendant's retained counsel sent Juba a letter stating that "the Board of Directors took action to terminate your Employment Agreement and your employment with GCU effective June 10, 2025." The letter applied to all subsidiary entities, including GCU Holding Company, Seven Oaks Country Club, GCU Real Estate, and GCU Agency. The letter stated no reason for the termination.

47.  Also on May 9, 2025, HR Manager Dietrich sent an organizational announcement to GCU and Seven Oaks staff stating that at the May 8 Board meeting "a decision was made to end the employment of George Juba as President of GCU and all it's [sic] subsidiaries [sic] companies effective immediately."

48.  Defendant replaced Juba as President and CEO of GCU and its subsidiary companies with Jeremy Stephenson, who was approximately twenty-five years younger than Juba.

10

**I. Defendant's Shifting Post-Hoc Justifications**

49.  The May 9, 2025 termination letter stated no reason for the termination.

50. On July 17, 2025, Defendant first articulated its alleged reasons for the termination in an EEOC Position Statement. Defendant asserted that the Board had concerns about Juba's attention to GCU's financial operations, his work hours, his time spent at Seven Oaks, Seven Oaks' management during his leave, a federal lawsuit involving Seven Oaks, and his alleged refusal to cooperate with the Board. Stephenson and General Counsel Trbovich verified the Position Statement.

51.  On March 24, 2026, Defendant supplemented its EEOC response and asserted an additional reason not stated in the termination letter or initial Position Statement: that Juba's alleged failure to keep regular office hours breached his Employment Agreement and the Employee Handbook and rendered him unqualified for the job.

52.  Defendant's stated reasons were inconsistent with its contemporaneous records and prior treatment of Juba. Before Juba's medical leave, Defendant had reelected him President and approved a salary increase. During his leave, Defendant's own reports attributed GCU's 2024 financial loss to external interest-rate conditions and praised Seven Oaks' revenue and membership growth. Defendant had not disciplined Juba for the alleged performance issues during his forty-five years of employment.

**J. Defendant's Age-Based Long-Term Disability Benefit Structure**

53.  Section 5(d) of the Employment Agreement obligated Defendant to "make available to Employee health, dental, vision, life, short-term and long-term disability insurance benefits in

11

accordance with and subject to the terms and conditions of Employer's plans" throughout the Employment Period. The Agreement draws no distinction based on the age at which Juba might become disabled, and no written amendment to Section 5(d) was ever executed.

54. On January 6, 2025, the first business day after Defendant learned that Juba required a heart transplant, HR Manager Dietrich responded to Juba's son Christopher by email regarding long-term disability benefits. Dietrich wrote: "The handbook that I forwarded to you earlier states that long term disability is for employees who become disabled before age 65, disability benefits are payable until the later of the date you reach social security retirement or 36 months. So, I can reach out to Principal our carrier for confirmation, but I don't think he is eligible for Long term." Juba was 70 years old.

55 On  March 31, 2025, Chairman Kofel directed Juba to apply for long-term disability through Principal Insurance "if you meet the qualifications per their requirements."

56.  In its July 17, 2025 EEOC Position Statement, Defendant represented that during Juba's medical absence, "he received his full salary and all insurance benefits." That statement did not disclose Dietrich's January 6, 2025 communication that Juba likely was ineligible for long-term disability benefits because he became disabled after age 65.

## COUNT I

### DISABILITY DISCRIMINATION  AMERICANS WITH DISABILITIES ACT  42 U.S.C. § 12112(a)

57.  Juba incorporates by reference the preceding paragraphs as though fully set forth herein.

58.  Juba is disabled within the meaning of the ADA. He underwent a heart transplant in January 2025, and his post-transplant condition substantially limits cardiovascular function and

circulation and requires lifelong medical management. Defendant also regarded Juba as disabled.

59. Juba was qualified to perform the essential functions of his position. On April 28, 2025, his treating physician released him to return to work and certified that he could perform all functions of his position with or without accommodation.

60. Defendant terminated Juba's employment on May 8, 2025, seven days after he returned to work from disability-related medical leave.

61. The timing of the termination, Defendant's medical questioning on the day Juba returned, Defendant's suspension of his work access during leave, Defendant's exclusion of him from the April 2025 Board meeting, the absence of prior discipline, and Defendant's shifting post-hoc explanations support a reasonable inference that Defendant terminated Juba because of his disability.

62. As a direct and proximate result of Defendant's conduct, Juba suffered lost wages and benefits, lost earning capacity, damage to his career and professional reputation, emotional distress, and other compensatory and economic damages. Defendant acted intentionally, willfully, and in reckless disregard of Juba's federally protected rights.

## COUNT II

### AGE DISCRIMINATION AGE DISCRIMINATION IN EMPLOYMENT ACT  29 U.S.C. § 623(a)(1)

63. Juba incorporates by reference the preceding paragraphs as though fully set forth herein.

64. Juba was seventy years old when Defendant terminated his employment and was protected by the ADEA.

65. Juba was qualified for his position. He had served as President for approximately

eighteen years, had been employed by Defendant for approximately forty-five years, had received raises and/or bonuses throughout his presidency, and had been reelected President shortly before his medical leave.

66. Defendant replaced Juba with Jeremy Stephenson, who was approximately twenty-five years younger.

66. During Juba's medical leave, Stephenson repeatedly asked Christopher Juba what Stephenson could do to get Juba to retire and referred to Juba and CFO Tim Demetres as "Statler and Waldorf," the elderly balcony characters from The Muppets. Stephenson later replaced Juba and verified Defendant's EEOC Position Statement.

68. Defendant fired Juba because of his age. But for Juba's age, Defendant would not have terminated his employment.

69. Defendant's conduct was willful.

70. As a direct and proximate result, Juba suffered lost wages and benefits, lost earning capacity, reputational harm, emotional distress, and other damages.

COUNT III

**VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT 43 Pa. Cons. Stat. § 955**

71. Juba incorporates by reference the preceding paragraphs as though fully set forth herein.

72. Juba exhausted his administrative remedies under the PHRA. His original Charge was filed June 4, 2025. The age-discrimination allegations in his February 9, 2026 Amended Charge relate back to the original PHRC filing because they arise from the same termination decision and course of conduct alleged in the original Charge. This action is filed more than one

14

year after the PHRC filing, and the PHRC has not dismissed the action or entered into a conciliation agreement naming Juba as a party.

73. Defendant fired and otherwise discriminated against Juba because of disability in violation of the PHRA.

74. Defendant fired and otherwise discriminated against Juba because of age in violation of the PHRA.

75. As a direct and proximate result of Defendant's conduct, Juba suffered lost wages and benefits, lost earning capacity, reputational harm, emotional distress, and other damages.

**COUNT IV**

**BREACH OF EMPLOYMENT AGREEMENT: VIOLATION OF TERMINATION REQUIREMENTS**

76. Juba incorporates by reference the preceding paragraphs as though fully set forth herein.

77. The Employment Agreement is a valid and enforceable written contract governed by Pennsylvania law.

78. Section 9 of the Employment Agreement limits Defendant's right to terminate Juba's employment to three grounds: death or qualifying disability;  termination without cause upon at least thirty days' prior written notice;  or termination for cause upon written notice outlining the cause reason.

79. Defendant's May 9, 2025 termination letter stated no cause reason. To the extent Defendant fired Juba for cause, Defendant breached Section 9(c)'s written-notice requirement.

80. Defendant also lacked cause. Defendant did not allege dishonest or fraudulent conduct, criminal conduct, or a material breach of the Employment Agreement. The Agreement

required Juba to perform his duties primarily from Defendant's Beaver, Pennsylvania office, but did not impose specific office hours. The Agreement also required Juba to uphold applicable bylaws, which included raising the Seven Oaks governance issue.

81.  Defendant did not establish fair and reasonable performance standards that Juba failed to meet. Juba had not received discipline, warnings, a performance improvement plan, or negative performance reviews concerning the issues Defendant later identified. Defendant reelected him and approved a salary increase shortly before his medical leave. Defendant first presented the Back to Work Memo on May 1, 2025 and voted to terminate him seven days later.

82.  To the extent Defendant contends it terminated Juba without cause, Defendant breached the Agreement by removing him from his positions and announcing his termination as effective immediately rather than honoring his contractual rights during the notice period.

83.  As a direct and proximate result of Defendant's breach, Juba suffered lost wages, lost benefits, damage to professional standing, consequential damages, prejudgment interest, and other damages available under Pennsylvania law.

## COUNT V

### BREACH OF EMPLOYMENT AGREEMENT: SECTION 5(g) PAID TIME OFF

84.  Juba incorporates by reference the preceding paragraphs as though fully set forth herein.

85.  Section 5(g) of the Employment Agreement provides that, subject to Defendant's stated vacation policy for similarly situated employees, Juba was entitled to accrue paid time off beginning at four weeks per year.

86.  At the onset of Juba's leave, Defendant provided his family with the 2015 Employee

Handbook, which entitled employees with twenty-one or more years of service to twenty-five PTO days per year, allotted in January and available for immediate use. Juba had more than forty years of service and was entitled to 187.5 PTO hours for 2025 under that policy.

87.  Defendant instead applied a revised PTO policy that had not been incorporated into Juba's Employment Agreement by written amendment. Defendant limited Juba to 44.4231 hours of PTO before placing him on short-term disability, resulting in a shortfall of 143.08 hours.

88.  Defendant also failed to pay Juba accrued but unused PTO in his final paycheck following involuntary termination.

89. Defendant's conduct breached Section 5(g) of the Employment Agreement. Juba's unpaid PTO damages include not less than $28,609.19 for the January 2025 PTO shortfall and approximately $32,474.87 in unpaid accrued termination PTO, subject to verification through payroll records, plus prejudgment interest and other available relief.

## COUNT VI
### VIOLATION OF THE PENNSYLVANIA WAGE PAYMENT AND COLLECTION LAW  43 Pa. Stat. Ann. §§ 260.1 et seq.

90. Juba incorporates by reference the preceding paragraphs as though fully set forth herein.

91.  The Pennsylvania Wage Payment and Collection Law provides a statutory remedy for an employer's failure to pay wages, fringe benefits, and wage supplements owed under a contract or agreement.

92 Juba's accrued PTO constituted wages, fringe benefits, or wage supplements within the meaning of the WPCL. Section 5(g) of the Employment Agreement and Defendant's stated

17

vacation policy established the contractual basis for Juba's PTO entitlement.

93. Defendant failed to pay Juba 143.08 hours of PTO for January 2025 and failed to pay accrued PTO upon his involuntary termination.

94. Defendant had no good-faith basis to withhold those wages. The PTO policy Defendant applied had not been communicated to Juba, had not been tracked for him in Paylocity, and had not been incorporated into his Employment Agreement by written amendment.

95. Juba is entitled to recover unpaid wages of approximately $61,084.06, liquidated damages, reasonable attorneys' fees, costs, and all other relief available under the WPCL.

WHEREFORE  Plaintiff George N. Juba respectfully requests the Court enter  judgment in his favor and against Defendant Greek Catholic Union of the USA and award:

(a) declaratory judgment that Defendant violated the ADA, ADEA, PHRA, WPCL, and Employment Agreement;

(b) back pay, lost wages, lost benefits, and all other compensation owed from the date of termination through judgment;

(c) front pay and future lost earnings;

(d) compensatory damages, including emotional-distress and reputational damages, to the extent permitted by law;

(e) punitive damages under the ADA;

(f) liquidated damages under the ADEA;

(g) unpaid PTO wages, statutory liquidated damages, attorneys' fees, and costs under the WPCL;

(h) contract damages, including unpaid PTO, unpaid accrued termination PTO, unpaid bonus compensation, consequential damages, and prejudgment interest;

18

(i) attorneys' fees, costs, and expenses as authorized by law; and

(j) all other relief this Court deems just and proper.

**JURY TRIAL DEMANDED**

Respectfully submitted,

**SAMUEL J. CORDES & ASSOCIATES**

s/ *Samuel J. Cordes*

Samuel J. Cordes
Pa. ID. Number 54874

305 Woodstream Drive
Pittsburgh, PA 15238
(412) 519-4663
sjcordes@sjcemploymentlaw.com
Attorney for Plaintiff George N. Juba